CHAMPLAIN CONST. CO. v. O'BRIEN et al.*

O'BRIEN et al. v. CHAMPLAIN CONST. CO. et al.

(Circuit Court, D. Vermont. June 11, 1902.)

1. CONTRACT FOR RAILROAD CONSTRUCTION—DELAY IN COMPLETION OF WORK—LIQUIDATED DAMAGES.

Liquidated damages stipulated for in a contract for railroad construction for each day's delay in the completion of the work after the time fixed cannot be deducted against the contractor where the delay was caused by the default of both parties, and it is impossible to apportion the damages between them.

2. SAME—TAKING POSSESSION OF PLANT OF CONTRACTORS—LIABILITY FOR USE.

Where a railroad construction company took over the working plant of a firm of contractors under the protection of an injunction, claiming the right to do so and to use it in completing the work at the expense of the contractors under the terms of the contract, because of the contractors' default, but it was afterward adjudged not to have such right, it is liable to the contractors for the reasonable value of the use of the plant which it employed in completing the work on its own account.

3. SAME—STATEMENT OF ACCOUNT.

Account stated between the parties to a contract for railroad construction.

4. CONTRACT—VALIDITY—CONSIDERATION.

The bid of a firm for the construction of a railroad was reduced by their agent without authority, and they refused to execute the contract at the reduced price. To induce them to do so, a third person orally agreed to pay a sum in addition to the contract price for a certain class of the work, in consideration of which they executed the contract and performed the work. *Held*, that such agreement was valid and binding on the promisor.

In Equity.

Alfred A. Hall, Thomas W. Moloney, and Fred M. Butler, for O'Brien & Sheehan.

William H. Button, Frederick H. Button, and William B. C. Stickney, for companies and Clement.

* For settlement of decree, see 117 Fed. 788.

WHEELER, District Judge. These suits grew out of a contract by O'Brien & Sheehan with the Construction Company, guarantied by the Rutland Railroad Company, for building the Rutland-Canadian Railroad along the shore and across islands and waters of Lake Champlain, between Burlington, Vt., and near Rouses Point, N. Y., the parts of which now material are:

"First. That the said contractors, having examined the specifications herein contained, and of this agreement forming a part, for grading, masonry, track-laying, and ballasting on about fifty miles of proposed railway to extend from Burlington, Vermont, to the vicinity of Rouses Point, New York, have agreed, and by these presents do agree, with the said company, for and in consideration of the payments hereinafter mentioned to be made to them by the said company, and under the penalty expressed in a bond for fifty thousand dollars ($50,000), bearing date even with these presents and made a part hereof, to furnish, at their own expense, all the necessary tools, plant, appliances, labor, and materials, excepting only such as are herein expressly stated to be furnished by the company, and in a good, substantial, and workmanlike manner, and in strict accordance with the said specifications, construct and complete said grading, masonry, track-laying, and ballasting, and the incidental work herein specified, on or before the first day of October, 1899. Time is to be of the essence of this contract. It is mutually agreed between said parties that a bonus shall be paid by the company to the contractors for completion before the first of October, and liquidated damages shall be reserved by the company from the contractors for delay after the said first day of October, both as provided in the said specifications. The contractors also agree to have the masonry for all railroad bridges finished, ready to receive the bridge superstructures, on or before the fifteenth day of June, 1899.

"Second. The said contractors further agree that they will indemnify and save harmless the company from all claims for loss or damage on account of the performance of this work, whether arising from negligence or otherwise. And the said contractors further agree that any part of the moneys at any time due to them under this agreement may be retained by the said company until all suits or claims for damages as aforesaid, and all suits or claims on account of labor or material furnished the contractors for this work, shall have been finally terminated.

"Third. It is further agreed that if at any time the progress of the work, or the character of appliances and materials furnished, is not such as, in the opinion of the company's chief engineer, will secure the completion of this contract within the time stipulated herein, or is not in accordance with the said specifications, then the company may serve written notice on the contractors to increase the progress of the work, or to improve the materials for it so as to conform to the said specifications; and if on the expiration of ten days after the service of such written notice upon the contractors personally, or by leaving the same at their office, No. 253 Broadway, in the city of New York, the contractors shall fail to furnish the company satisfactory evidence of their efforts, ability, and intentions to increase said progress or improve said materials, the company, if it so elect, may thereupon enter and take possession of the said work, or any part thereof, with the tools, materials, plant, and appurtenances thereon, and hold the same as security for any or all damages or liabilities that may arise from the nonfulfillment of this contract within the time herein stipulated, and the company may use and employ said tools and other appurtenances and other proper means to complete the work at the expense of the contractors, and may deduct the cost thereof from any payments then due or that thereafter may become due to the contractors; and in case the contractors shall not complete the work within the time herein specified, and the company shall not have exercised its said election, or, notwithstanding such failure, shall permit the contractors to proceed with and complete the said work (as if such time had not elapsed), then such action shall not be deemed a waiver in any respect by the company of any part of the liquidated damages to be paid by the

contractors on account of delay beyond said first day of October in the completion of the work; nor shall the fact that the company does not enter upon and take over the work from the contractors prevent or estop the company from collecting the amount of liquidated damages herein agreed upon.

"Fourth. It is mutually agreed between the parties hereto that the chief engineer appointed by the company shall in all cases determine the quality and quantity of the several classes of work to be done and paid for under this contract; he shall decide all questions that may arise relative to the fulfillment of this contract on the part of the contractors, and his estimates shall be final and conclusive evidence of the total amount and value of the work performed by the contractors under this agreement; and such estimates and decisions shall be a condition precedent to the right of the contractors to receive any money or compensation for anything done or furnished under this agreement. And it is hereby expressly agreed that the company shall not be precluded or estopped by any return or certificate made or given by any engineer, inspector, or other officer, agent, or appointee of said company, under or in pursuance of anything in this agreement contained, from at any time showing the true and correct amount and character of the work which shall have been done, and materials which shall have been furnished, by the said contractors or by any other person or persons under this agreement. It is hereby further agreed that no claims for extra work shall be allowed unless the work shall have been previously ordered by the chief engineer in writing, except in a case of urgent necessity or emergency, and in the latter case all claims for extra work or otherwise done in any month shall be made to the chief engineer in writing before the third day of the following month; and if, in his opinion, such extra work was not of urgent necessity for an emergency, it shall be disallowed and not paid for by the company.

"Fifth. The company agrees to deliver sufficient scrap rails and ties for one-half mile of track for the contractors' use in construction at each of the three following places, viz.: Allen's Point on south end of South Hero Island, Tromp's Point on north end of said island, and Pelot's Point on north end of North Hero Island, on or before the fifth day of March, 1899, and such further quantities of scrap rails and ties as may thereafter be required for the contractors' use in construction as shall from time to time be certified by said chief engineer to said company to be necessary.

"Sixth. The company agrees to deliver at the several places named in said specifications the new rails, splices, spikes, and ties on or before the first day of July, 1899, or at such later day as the said contractors shall ten days prior to July 1, 1899, in writing, designate to said company, and to have the superstructure of all railroad bridges erected in place on or before the fifteenth day of August, 1899.

"Seventh. It is expressly understood and agreed between the parties hereto that the plans for the three lake crossings on Lake Champlain are subject to the approval of the war department of the United States, and in the event that the plans that are now before the war department are not approved, and changes therein become necessary, the contractors shall have no claim against the company for any profit that they might have made if such crossings had been constructed as shown in said plans, but said contractors shall construct such crossings in the manner required by said war department, and shall be paid therefor according to said specifications. * * *

"The work under this contract is to include grading, masonry, ballasting, and track-laying, and all roadbed and substructures, but not the steel-bridge superstructures nor station buildings. For the work under this contract the contractor is to furnish all labor and all plants and appliances, excepting only construction trains, if he chooses to call upon the company for said trains, as provided hereinafter; and he is to furnish all necessary materials, excepting only ties, rails, splices, ballast pits, and spur track to quarry or quarries or to ballast pits. All excavations shall be classified under the following heads, viz.: 'Earth,' 'Loose Rock,' 'Solid Rock.' Earth shall include sand, loam, gravel, clay, and all other earthy matter, and loose stone or bowlders that do not exceed 3 cu. ft. Loose rock shall include all stone and detached rock containing between 3 cu. ft. and 3 cu. yds. Solid rock shall include all sound

rock occurring in masses exceeding 3 cu. yds. The width of roadbed at subgrade 1 ft. below base of rail will generally be 20 ft. in excavation and 15 ft. in embankments, with side slopes generally 1½ to 1 in earth and ¼ to 1 in rock, or of such other widths or slopes as the engineer may in writing direct. The lake crossings will be made with rubble stone embankment, having drawbridge openings where designated. The material for these embankments will be obtained principally from the rock cuts for the roadbed near these crossings and by widening these cuts. The interior portion of these embankments shall be made of stone of such sizes as naturally blast out of these cuts. These rubble stone embankments will be measured in embankment only. None of the material composing it will be measured or paid for as excavation, whether it is obtained from the roadbed, right of way, or from borrow pits or quarries. In measuring the rubble stone embankments, the engineer shall ascertain the settlement, if any, and measure as accurately as possible the entire embankment, including such settlement. The right of way, extra widths for borrow pits, and the ballast pits shall be furnished by the company without cost to the contractor and without delaying his work. All quarry sites outside of the right of way for affording stone for rubble embankment, bridge masonry, or otherwise, shall be furnished by the contractor. But the company shall provide these quarries at points convenient to the work on the contractor's payment to it of the sum of five hundred dollars ($500.00). In any case the company shall lay spur tracks to quarry sites and ballast pits without cost to the contractor. All grading, excavations for foundations on land or in water, for ditches, berm ditches, culverts, or otherwise, except the material for forming the rubble stone embankments as hereinbefore specified, shall be measured, estimated, and paid for as excavation only, in its proper class as earth, loose rock, or solid rock. If the contractor grade in excess of the directed width in excavation, earth embankment, rubble stone embankment, or otherwise, then such excess shall not be paid for. The price paid for excavation in all the several classes thereof will be understood to cover and pay for the entire expense of its removal by any method whatever, including loading, unloading, transportation, and deposit, in the manner prescribed in these specifications, in the places designated by the engineer: provided, the average haul of the material so transported does not exceed one thousand feet (1,000 ft.), and beyond that distance one-half of one cent per cubic yard per hundred feet (100 ft.) will be allowed and paid for such extra haul. When required by the engineer, the contractor shall riprap the face of embankment or the foot of slopes as protection against action of water. The riprap is to be laid by hand by competent workmen, and be of such thickness and slope and of such ordinary stone as is most convenient. It shall be measured and paid for by the cubic yard. If the contractor abandon any part of the work, or if, in the opinion of the engineer, he do not maintain upon it such rate of progress as would be necessary to complete the work within a reasonable time, the company may take over and enter upon the work and complete it at the contractor's expense. * * *

"The final estimate shall be based on the quantities which shall be deducted by the chief engineer from accurate actual measurements as provided in said specifications, taken together with the following prices, which are to prevail in this contract, to wit: Earth excavation, per cubic yard, eighteen cents ($0.18); loose rock excavation, per cubic yard, forty cents ($0.40); solid rock excavation, per cubic yard, forty cents ($0.40); rubble stone embankment, per cubic yard, 40 cents ($0.40); track-laying, main and single track, per mile, two hundred and fifty dollars ($250.00); track-laying, side single track, per mile, two hundred and fifty dollars ($250.00).

"The Rutland Railroad Company, a corporation created by and existing under the laws of the state of Vermont, and having its principal office at Rutland, in the county of Rutland and state of Vermont, in consideration of one dollar received to its full satisfaction of O'Brien & Sheehan, copartners, having their office and principal place of business at No. 253 Broadway, New York, and in the further consideration of the execution by said O'Brien & Sheehan of a contract with the Champlain Construction Company on the 20th day of February, A. D. 1899, for the construction of the Rutland-Canadian

Railroad, hereby covenants and agrees with the said O'Brien & Sheehan that the said Champlain Construction Company. will faithfully perform all the conditions and matters to be performed by it, according to the terms and conditions of said contract, and hereby guaranties that said Champlain Construction Company will faithfully perform all said terms and conditions."

The time of completion was extended to May 20, 1900, and the work and working plant of the contractors were taken over by the Construction Company, protected by an injunction from the state court in the first of these causes, October 12, 1900.

One principal question is as to the right of the Construction Company to take over the work and complete it at the expense of the contractors, with their plant. This question was considered in Construction Co. v. O'Brien (C. C.) 104 Fed. 930, on a motion to dissolve the injunction of the state court, after removal to this court. The conclusion was then reached that the case as it then stood did not show any right to take over the plant and use it to complete the work at the contractors' expense. Since then a motion has been made to amend the bill to set up an agreement that this might be done, which was continued to the hearing, with leave to take testimony to support or deny the allegations of the amendment. The testimony does not come up to sustaining these allegations, and the use of an injunction to obtain the possession directly negatives the idea that it was taken under a peaceable arrangement. As the case now stands, the taking over of the work was right, for doing it by the company as its own work, at its own expense, with accountability for the use of the plant belonging to the contractors in doing its work. The rights and liabilities of the parties as to the work done by the contractors up to the time of the taking over, and the use of the plant by the company afterwards, are therefore to be ascertained.

The contract refers all classifications, measurements, computations, and adjustments to the chief engineer. The ascertainment of the quantities of the lake fills was difficult, and as to one a joint measurement by engineers representing the contractors and the company respectively was had, and the results were acquiesced in by all and adopted by the chief engineer as correct. Afterwards suspicion was raised as to the joint measurement, and remeasurement was made by the company through experiments in drilling down through the embankments to ascertain their depth. They made the depths and quantities very much less, and the amount allowable for the work about $110,000 less. These remeasurements appear to have been made with great care under the difficulties, and by themselves would seem to be sufficiently accurate. But the joint measurement was made with care also by those acting in the interest of their respective sides, and therefore entitled to great weight, and it compares better with the preliminary surveys of the lake bottom. On the whole, it seems to be the safest, and is followed, and the engineer's estimates of the other lake fills are taken to be correct, and followed.

The engineer has computed overhaul at the rates provided for in the contract on excavations for land fills, and not for lake fills. The contractors claim that the method of computing it where allowed is not correct, and that it should be allowed for all fills. The specific pro-

visions of the contract for obtaining material for, construction of, and compensation for the lake fills appear to confine them to these stipulations, and to exclude all other general provisions as to ascertaining compensation for them. The method followed appears to leave some quantities hauled over 1,000 feet not reckoned; and, if the contract had simply provided for overhaul where applicable in excess of 1,000 feet, the result would appear to be clearly too small. But the overhaul provided for is "average" overhaul; and the averaging done by computing from centers of gravity of excavations to those of fills, and allowing for all over 1,000 feet so found, instead of finding the centers of gravity for all quantities moved more than 1,000 feet, seems to be within the terms of the contract in this respect, which were to be carried out by the chief engineer, and his use of it under the contract seems to be final. Some material not within the overhaul clause had to be hauled further than was anticipated, and compensation quantum meruit is claimed; but that seems to be met by the clause in the contract putting such conditions and locations at the risk of the respective parties.

Riprap for rubble embankments, dumped and placed, was to be $1.75 per cubic yard; 30,867 yards dumped appear to be allowed for at but $1.25, because not placed. This difference appears to be too great. According to the evidence, 10 cents per yard would be sufficient for the placing, and 40 cents more per yard should be allowed on this number of yards, making $12,346.80 which should be allowed in addition.

Items amounting to $2,687.82, as shown by contractors' Exhibit 151, appear by concession to have been deducted twice from estimates, and that amount should be allowed to the contractors to correct that error.

Extra cost of laying old rails and joints instead of new, that by the contract were to be furnished, is admitted to be allowable, and on the evidence is allowed for 44.04 miles at $125 per mile, amounting to $5,505.

The company took over the plant materials on hand belonging to the contractors, for which $10,687.10 is allowed to them.

Use of 55 dump cars, costing $3,300, appears to have been charged and deducted from estimate to the amount of $13,981.30. This seems to be too exorbitant to be allowed to stand. One-half their value seems reasonable, leaving $12,631.30 of the amount deducted to be replaced.

The contractors were dilatory in some respects about proceeding with the work, and the company deducted the $400 per day for delay for the 11 days of May, 1900, after the expiration of the last extension on the 20th from the estimates of that month. The contractors protested, and the amount was restored. Against the protest of the contractors, deductions were made again for each day after to the taking over of the work October 12th, amounting in all to $54,200. The contractors insist that this amount should be restored. This deduction was provided for originally, and carried along in extensions always as liquidated damages for delay. If it had been attributable solely to the shortcomings of the contractors, the deductions would have been en-

tirely justifiable, but they would not be proper unless damages as such would be recoverable. That damages are not recoverable by one of another for consequences flowing from both is familiar law of constant application. The line connected at each end with existing railroads, and rights of way for making connections for taking on materials there and for doing the work elsewhere were not acquired, and plans and materials to be furnished by the company were not provided till after the contractors were entitled to them, and these hindrances contributed substantially to the delay for which the deductions were made. If they should be left to stand, the company would recover damages of the contractors for its own neglects. There is no way for summing up the defaults of each and apportioning the damages to them, but the whole must be allowed or none; and, as all cannot be, none must be. These deductions must therefore be restored.

Wider excavations than called for were made for convenience in use of steam shovels, and are claimed for, but that they shall not be allowed for is expressly provided in the contract.

What is called shale was encountered by the contractors in excavations. It appears to have been classified by the chief engineer temporarily as rock, but finally as earth. The classification of materials to be moved is provided for in the contract, and that is to govern according to common language rather than by scientific terms. This is not loose rock mentioned, and must be earth, if not sound rock. It does not seem to be sound rock, however seamy ledges might have to be classified. Rock would not need to be absolutely sound and free from all seams, for classification as such, but only generally sound in layers or masses which would separately be understood to be rock in common speech. There would be none or but little absolutely sound rock excavation on the line, still a great deal of rock moved had been very properly classified as such, but it was sound in rock quantities as contemplated by the contract, and this is not, or not so clearly so as to be without the discretion of the chief engineer, to whom such doubts were by the contract finally referred.

The evidence of the contractors admits, by their Exhibit 69C, items chargeable to them amounting to $39,387.74, and, by their Exhibit 158, such items not deducted from estimate amounting to $19,464.22. Those not before deducted should apparently be deducted now. The company admits charges for extra work not credited amounting to $1,921.26, which apparently should be allowed now.

The riprap was at the agreed price quite profitable to the contractors, and was stopped by the chief engineer on a suggestion from the president before what had been directed was completed. The contractors claim damages for not being allowed to go on with it. But, as the embankments were by the terms of the contract to be riprapped only "when required by the engineer," there would be no basis for damages about what should not be so required, whatever his motives might be. There would be no breach of any stipulation for a foundation. They had when stopped done some work toward continuing under the prior direction, for which they seem entitled to fair compensation, that is found to be $2,000.

| | | |
|---|---|---|
| The estimates to October 12, 1900, appear to amount to | $870,497 | 59 |
| Extra for laying old rails | 5,505 | 00 |
| Due on riprap done | 12,346 | 80 |
| Preparing riprap ordered | 2,000 | 00 |
| Materials taken October 12, 1900 | 10,687 | 10 |
| Admitted extras | 1,921 | 26 |
| | $902,957 | 75 |

| | | | |
|---|---|---|---|
| Prima facie payments | $780,748 | 16 | |
| Supplies not deducted | 19,464 | 22 | |
| | $800,212 | 38 | |
| Overpaid on dump cars | $12,631 | 30 | |
| Charged twice | 2,687 | 82 | |
| | | 15,319 | 12 |
| Net payments | | 784,893 | 26 |
| Due as of October 12, 1900 | | $118,064 | 49 |

The use of the plant under the accountability required for maintaining the injunction was had in doing the work of the contract, and is to be allowed for at its fair and just value as near as may be under the circumstances, according to the evidence. This is difficult to fix; but on much consideration of its value when taken, of the work actually done with it, of its value when returned, and its whole situation, $30,000 seems nearest to what is right, and is the amount arrived at. This makes due from the company to the contractors $148,064.49.

There are many comparably small items in controversy, not mentioned nor mentionable within proper limits in detail, some not proved at all, some not established as required by the contract, some the disposition of which has been acquiesced in, and some which have been abandoned. None are thought to have been overlooked in consideration, but, if any are made to appear to have been, they may be adjusted on settlement of the decree.

The contractors' bid was reduced 2 cents per yard for earth excavation by their agent without their knowledge. When they learned of it they declined to execute the contract. To induce them to go on, the defendant Clement offered to pay 5 cents per yard in addition to the bid of 40 cents for rubble embankment, whereupon they executed the contract at the bid prices. This was done wholly by parol, but thus far there is no fair dispute upon the testimony. The contractors claim that he made this agreement as president for the Rutland Railroad Company; Clement claims that it was to be merely a gratuity of that amount, if the work should be well completed in time, according to the contract. No express authority for making such an agreement in behalf of the railroad company is shown; and, as the work was to be done upon the road of another company, it would not seem to be within the scope of his general authority as president. If he acted without authority he would, of course, bind only himself; and from the testimony it is not found that he assumed to act for any one but himself. The witnesses may have inferred, and from that have understood, that he acted as president from his well-known position as such. The testimony seems to show fairly and sufficiently that the contractors were by him given to rightfully understand that this was to be paid as compensation, and not as a gratuity. The consideration moving

from the contractors was the execution of the contract with the Construction Company, and was ample. Although founded upon, this promise was independent of and not collateral to, the written contract of the company. It never agreed to pay this five cents per yard; that was not and never would be its debt, nor a failure to pay that be its default; and Clement's agreement was not one to answer for the debt or default of the company, but one that created a debt of his own, which seems to be valid. There appear by contractors' Exhibit 69 to have been 1,016,123 yards of this embankment, amounting, at five cents per yard, to $50,806.15.

The right to the injunction wholly fails, and there is no other relief to which the company is entitled in the first case; but the right of the contractors to compensation for the use of their plant, which was protected by the provision for accountability on continuing the injunction, remains to them by that, as well as according to their rights as owners of the plant, and should not be disturbed.

In the first case let a decree be entered dismissing the bill, without prejudice to accountability for use of plant, and without costs.

In the other case let a decree be entered that the Champlain Construction Company pay to the plaintiffs $148,064.49 within 20 days, and in default thereof that the Rutland Railroad Company pay the same within 20 days after, with costs, and that defendant Clement pay to the plaintiffs $50,806.15 within 20 days, without costs.

At the settlement of the decree the amount due as of October 12, 1900, from the construction company was modified to $112,624.62, and from Clement to $47,070.15.