142      WILEY v. HART.

Syllabus.       [74 Wash.

[No. 10729. Department One. June 13, 1913.]

## H. E. WILEY et al., Appellants, v. JOHN B. HART et al., Respondents.[1]

APPEAL—REVIEW—FINDINGS. Findings upon conflicting evidence will not be disturbed on appeal, where it cannot be said that the trial court, hearing and seeing a large number of witnesses, did not fairly measure the evidence.

CONTRACTS — BUILDING CONTRACTS—EXTRAS — WRITTEN ORDERS OF ARCHITECT—NECESSITY. The owners are not liable for extras orally agreed to by the architect, acting as the owners' agent, where the owners did not agree to or have any knowledge thereof, and the building contract provided that no alterations should be made except upon a written order of the architect.

CONTRACTS — BUILDING CONTRACTS — DEMURRAGE — IMPRACTICABLE APPORTIONMENT OF DAMAGES. Nothing can be allowed under a demurrage clause in a building contract for failure to complete the building on time, where it appears that, while the contractors were dilatory, a considerable portion of the delay was due to the acts of the architect, as agent of the owners, and also to the fault of the owners in not completing the building sooner after taking possession, making it impracticable to apportion the damages.

INDEMNITY—BUILDING CONTRACTS—LIENS—ATTORNEY'S FEES—DAMAGES—MITIGATION. The owners of a building, seeking recovery from the contractors' surety for their default in performance, are not obliged to settle with lien claimants before judgment foreclosing the liens, in order to mitigate damages by saving attorney's fees in the foreclosures, where they used due diligence to ascertain the just amount of the claims without obtaining such information as would justify their payment before judgment.

PRINCIPAL AND SURETY—DISCHARGE OF SURETY—ALTERATIONS—CONSENT. A surety company guaranteeing the performance of a building contract is not relieved from liability by reason of material changes in the contract, where it had notice of the changes and consented thereto; especially where the only damages allowed were those resulting from liens and defective construction.

COSTS—ON APPEAL—DISCRETION. Where there are cross-appeals, and both sides are in a measure successful, costs on appeal are discretionary under Rem. & Bal. Code, § 1744, and may not be allowed to either party.

[1]Reported in 132 Pac. 1015.

Cross-appeals from a judgment of the superior court for King county, Tallman, J., entered January 5, 1912, in favor of the defendants, in consolidated actions to foreclose a mechanics' lien, and for damages for breach of contract, after a trial on the merits before the court.   Modified.

*Bevington & Chambers, Roberts, Battle, Hulbert & Tennant,* and *John W. Roberts,* for appellants.

*William Parmerlee* and *John B. Hart,* for respondents.

Parker, J.—The controversy involved in this appeal is between Wiley & Bevington, copartners, building contractors, the German-American Bank of Seattle, their assignee, and the National Surety Company, on the one side, and John B. Hart and wife, the owners of a building under contract for construction by Wiley & Bevington, on the other side.   There are involved claims of the contractors against the owners for the balance of the contract price, and a large number of items for extra work and material claimed to have been put into the building by them during its construction at the instance of the architect; and, also, claims of the owners against the contractors for damages resulting from alleged defective construction of the building, and from failure of the contractors to finish the building within the time specified by the contract.

In March, 1911, the Dungeness Logging Company commenced an action in the superior court for King county against the owners, seeking foreclosure of a lien upon the building, and for material claimed to have been furnished for its construction.   In July, 1911, the German-American Bank of Seattle, as assignee of the contractors for the balance claimed to be due them for the construction of the building, intervened in that action, seeking recovery of that balance from the owners and foreclosure of a lien claimed upon the building to secure the same, and also seeking to have brought into that action numerous other lien claimants and have their several claims adjusted therein.   Thereafter, these several lien claimants filed their answers and cross-complaints in that

action, setting up their several claims of lien and praying foreclosure thereof. On August 1, 1911, the owners commenced an action in the superior court for King county against the contractors and the surety company, seeking recovery of damages claimed as a result of defective construction of the building and failure to complete the building within the time specified in the contract, and making the German-American Bank and the lien claimants defendants in that action, to the end that their respective rights should be adjudicated therein. On August 3, 1911, the owners answered the complaint in intervention of the German-American Bank in the Dungeness Logging Company case, setting up in defense of the claims of the bank, as assignee of the contractors, in substance the same claims for damages as in the action against the contractors and the surety company two days previous, and also praying that the two actions be consolidated.

The action was manifestly commenced by the owners against the contractors and the surety company to recover an affirmative judgment for damages against them, in view of the fact that they could not be forced into the Dungeness Logging Company lien case for that purpose. This was at least true as to the surety company. The contractors and the surety company answered in the action commenced against them by the owners, and thereafter, on September 9, 1911, an order was entered consolidating the two actions. Thereafter, on November 7, 1911, the consolidated cases proceeded to trial before the court without a jury. The trial continued for several weeks, during which oral testimony was introduced occupying in this record over 4,000 typewritten pages. There were also exhibits introduced, and now in the record before us, numbering some 500 separate documents. Nearly all of this testimony and these documents relate to the controversy between the contractors, the bank and the surety company on the one side, and the owners on the other; there be-

ing but little evidence required to establish the claims of the several lien claimants.

On January 5, 1912, the superior court rendered its decree, establishing the several lien claims of laborers and materialmen who had filed their answers and cross-complaints in the Dungeness Logging Company case, decreeing foreclosure thereof against the building, allowing certain portions of claims for extras made by the contractors against the owners, allowing certain portions of claims for damages made by the owners against the contractors, including damages resulting from defective construction, for failure to complete the building within the time agreed upon, and from liens established against the building; and adjudging that the owners, John B. Hart and wife, recover from the contractors, Wiley & Bevington, and the National Surety Company, their surety, the sum of $8,073.05, which sum the court concluded was the balance due to the owners on account of their damages sustained, after deducting the amount the contractors were entitled to credit for upon the original contract and for extra work and material put into the building by them. Thereupon the contractors, Wiley & Bevington, the German-American Bank, their assignee, the National Surety Company, their surety, and the owners, John B. Hart and wife, all appealed from this disposition of the cause.

We will now notice some of the principal facts touching more directly the differences between these appellants, here involved. On October 17, 1910, John B. Hart entered into a contract with Wiley & Bevington, by which they agreed to construct an apartment building in Seattle upon a lot, the community property of Hart and wife, for the agreed price of $33,550, they to furnish all labor and material and construct the building "under the direction and to the satisfaction of H. Ryan, architect, acting for the purposes of this contract as agent for the owner," and according to plans and specifications prepared by him therefor. It was agreed in this contract that the building should be completed on or before

February 20, 1911, and that "should the contractor fail or refuse to complete the work at the time as above stated, then he shall pay to the owner the sum of $30 per day as agreed, settled and liquidated damages for each and every day's delay after the time fixed for completion." The contractors were, however, to have allowance for delays arising from certain enumerated causes beyond their control, among which were neglect and fault of the architect. It was also agreed that:

"No alterations shall be made in the work shown or described by the drawings and specifications, except upon a written order of the architect."

It was also agreed that payments should be made to the contractors from time to time as the building progressed, upon certificates of the architect, and further:

"That no certificate given in payment made under this contract, except the final certificate or final payment, shall be conclusive evidence of the performance of this contract, either wholly or in part, and that no payment shall be construed to be an acceptance of defective work or improper material."

It was also agreed that the contractor should furnish a surety bond to save the owners harmless from liens and from all losses or damages of whatsoever character arising in the execution of the contract. The bond having been executed accordingly with the National Surety Company, as surety thereon, the construction of the building was proceeded with by the contractors. The building was not completed on February 20, 1911, as agreed upon, nor was it completed to the satisfaction of the architect on May 24, 1911. On that day the contractors, in writing notified the architect, and also the owners, of their claim that the contract had been performed, and that they left the building completed according to the terms of the contract and arrangements for extra work and material, and demanded payment of the unpaid balance upon the original contract price of $5,550, and also of

the sum of $4,042 for extra work and material, which they claimed to have put into the building as shown by their itemized statement furnished to the architect and owners a few days previous. The architect and owners then declined to accept the building as completed, and declined to make payment of any of the sums so demanded. The building was abandoned by the contractors on May 24th, and thereupon the owners caused the same to be finished, as they claim, to conform to the plans and specifications of the contract made for its construction. In this work the owners claim to have necessarily expended over $7,000, and that they did not succeed in completing the building according to the contract and plans and specifications for its construction until July 12, 1912, which resulted in their further damage under the $30 per day demurrage clause of the contract, measurable by computation up until that date. These items, together with laborers' and materialmen's liens, aggregating $10,170 adjudged against the building, are claimed by the owners as the total amount of their damages resulting from the failure of the contractors to construct the building as agreed upon.

Relative to the claim made by the owners for damages resulting to them from the necessity of expending over $7,000 to finish the building according to the contract and plans and specifications, it is contended by counsel for the owners that the trial court erred in not allowing the full amount claimed by them therefor; while it is contended by counsel for the contractors, the bank, and the surety company, that the trial court erred in allowing any sum upon these claims. A laborious examination of large and numerously cited portions of this voluminous record, called to our attention in the briefs of counsel for the respective parties, convinces us that we are not called upon to enter upon a discussion of the vast number of detailed facts involved therein further than to say that we find such conflict in the testimony from which the rights of the respective parties must be determined that we cannot see our way clear to disturb the conclusions reached by the

trial court thereon. Generally speaking, it appears to us that there was a marked want of care and skill by the contractors in the construction of the building. We cannot say that the trial court, seeing and hearing the great number of witnesses whose testimony bore upon these numerous items of claimed damages, failed to fairly measure their total in making up its final decree.

Relative to the claims of the contractors for extra labor and materials put into the building because of alleged changes made in the plans and specifications by the architect as the building progressed, counsel for the contractors, the bank and the surety company contend that the trial court erred in not allowing the full amount claimed therefor; while counsel for the owners contend that the trial court erred in allowing any sum whatever for these claims. Passing the question of conflict in the evidence relative to these alleged changes in the plans and specifications, and the extra work and labor claimed to have been put into the building as a result thereof, we are met with one fact which we think is conclusively shown by the record and is determinative of those contentions. We have noticed that, when the contractors abandoned the building and claimed that it was completed on May 24th, in addition to their claim of $5,500 then unpaid upon the contract price, they claimed over $4,000 for extra work and material. This claim for extra work and material was thereafter increased, so that at the trial it amounted to approximately $7,000. The trial court in rendering its decision allowed $4,883 on these claims, in addition to allowing the contractors credit for the $5,500 retained by the owners upon the contract price, as an offset against the damages which it allowed to the owners. We think the record conclusively shows that none of these claims for extra work and material were based upon any "written order of the architect," except some small items to be hereafter noticed. Indeed, we are unable to find in the briefs of counsel that it is seriously so contended. Assuming that the architect caused such extra work and material to

be put into the building by oral direction, which is a matter in serious dispute, we think it clear from the record that the owners at no time consented to any such change or had any knowledge thereof. We are not referring to extras agreed to in writing and paid for without controversy. Under such a state of facts, we think the law is well settled that an owner cannot be held liable to pay for such extra work and material. In the case of *Langley v. Rouss*, 185 N. Y. 201, 77 N. E. 1168, the court of appeals, having under consideration this question, arising in practically the same manner as in this case, and under a contract the terms of which were in substance the same as here involved, held, in keeping with the general rule, that the owner cannot be held liable for such extra work and material, and, among other things, said:

"The contractor is not required to make changes or perform extra work unless he first receives written authority therefor and the contract is, therefore, neither unreasonable nor severe, and it should be enforced. An agent cannot enlarge his own powers by waiving the limitations thereon. In *Woodruff v. Rochester & Pittsburgh R. R. Co.*, 108 N. Y. 39, plaintiffs as sub-contractors did work upon the request of the engineers in charge of the work, and under an agreement made with them by which such work was taken outside of the contract, and was to be paid for at cost and ten per cent added, and this court said, 'if extra work, not covered by the precise terms of the contract, then it is provided in the contract that no claim should be allowed for such work, unless the same should be done in pursuance of a written order from the engineer in charge, and the claim made at the first settlement after the work was executed.' This was one of the terms of the contract, and we are unable to perceive that the engineers had any power or authority to alter or change it. It was inserted in the contract to protect the defendant from claims for extra work which might be based upon oral evidence, after the work was completed, and when it might be difficult to prove the facts in relation thereto. If the engineers in charge had an unlimited authority to change the contract at their will, and to make special agreements for work fairly embraced therein, then the defendant had very

little protection from the reduction of their contract to writing."

In the case of *McNulty v. Keyser Office Bldg. Co.*, 112 Md. 638, 76 Atl. 1113, the court disposed of the question, where it was similarly involved, in favor of the owners; and after quoting with approval from 6 Cyc. 29, and 2 Am. & Eng. Ency. Law (2d ed.), 821, said:

"In accord with this statement of the law is the case of *Baltimore Cemetery Co. v. Coburn*, 7 Md. 202. Coburn had agreed to erect a gateway for the Cemetery Co. at the entrance of the cemetery, and the written contract between them provided that 'should any alteration be contemplated from the design it may be done, provided the parties beforehand agree upon the price and endorse it upon the contract, and unless such agreement be also entered, it is to be taken to be an agreement to make the alteration without any change in price of the original contract.' The architect directed two windows to be placed in the gateway which he deemed necessary to its symmetry and beauty in consequence of the two chimneys being placed in a position different from that contemplated by the original plan, and Coburn sued to recover for this extra work. In refusing to allow Coburn to recover, Judge Tuck, speaking for the court, said: 'It is impossible to conceive the use of inserting any such provision, if it is to have no effect in a case like the present. Owners are very much in the power of builders and architects. Changes, apparently unimportant, are often made, the first knowledge of which comes to the owner in the shape of an additional charge for extra work. It may have been to prevent this, and the controversy that often arises from verbal arrangements suppletory to written agreements, that the parties had this cautious provision inserted. It was a clause for the benefit of both, especially for that of the owner. If the plaintiff, relying on the assurance of the architect, chose to perform this work without placing it within the protection afforded to the parties by the contract, he must bear the consequences."

In the case of *Brown v. Winehill*, 3 Wash. 524, 28 Pac. 1037, this court made remarks in harmony with these views, as follows:

"When parties have entered into a solemn agreement in writing, by the terms of which certain things are to be required as a condition precedent to payment, or other act, by either party, and such conditions are of such a nature that their performance or non-performance will also be evidenced by writings, public policy demands that neither of the parties should be held to have waived such conditions without proofs of the clearest and most satisfactory kind. The very object of the parties in entering into a written contract, and providing that the performance of certain required conditions be evidenced by writings, is to avoid any controversy or question of veracity that may arise in the course of the performance of such a contract."

See, also, *Baltimore & Ohio R. Co. v. Jolly Bros. & Co.,* 71 Ohio St. 92, 72 N. E. 888; *Van Buskirk v. Board of Education, etc.,* 78 N. J. L. 650, 75 Atl. 909.

Counsel for the contractors cite and rely upon the following decisions of this court: *Long v. Pierce County,* 22 Wash. 330, 61 Pac. 142; *Crowley v. United States Fidelity & Guaranty Co.,* 29 Wash. 268, 69 Pac. 784; *Cowles v. United States Fidelity & Guaranty Co.,* 32 Wash. 120, 72 Pac. 1032, 98 Am. St. 838; *Gehri & Co. v. Dawson,* 64 Wash. 240, 116 Pac. 673.

We think a critical reading of these cases will show that the owners were there held liable because of the general agency power of the architect beyond that which is shown in this case, or because the owners themselves authorized the change of the plans and specifications in such manner as to be an actual modification of the original building contract. In the *Long* case, it was held that the terms of the contract did not require a written order of the architect under the particular circumstances there involved, the claim of the contractor being that the extra work and the price therefor was agreed upon between him and the architect. The court held that this was sufficient to bind the county, the owner, since the contract required a written order from the architect for the doing of the extra work only when there was no agree-

ment as to the amount and value of such work at the time it was done. In the *Crowley* case, it was held that where the owner himself directed the extra work to be done he was liable to pay therefor. In the *Cowles* case, the provisions of the contract were waived by the owner himself. In the *Gehri* case, there was involved an instruction given to the jury which in effect submitted to it the question as to whether the owner had waived the provision of the contract relative to the architect directing the contractor in writing. Other cases cited by the counsel for the contractors we think can be similarly distinguished from the facts of this case. The owners not having waived the provisions of the contract requiring the architect to evidence his directions to the contractors in writing, we are constrained to hold that the owners were in no event rendered liable for the contractors' claims for extra work and material put into the building. It follows that the trial court erred in allowing these claims of the contractors in any sum whatever, except the small items to be hereafter noticed.

Relative to the claim of the owners for overtime under the demurrage clause of the contract, it is contended by counsel for the contractors, the bank, and the surety company that the trial court erred in allowing any sum on that account to the owners; while it is contended by counsel for the owners that the trial court erred in not allowing the full sum so claimed. These contentions present a most difficult problem. Indeed, the facts bearing upon it are so involved as to render it impracticable of solution with any degree of exactness, or to dispose of the question upon any sound logical basis. We think the evidence discloses faults both of the contractors and the architect. This view seems to have been entertained by the trial court, and seems to have largely influenced it in measuring the rights of the parties touching this claim. While there is evidence showing that the contractors were dilatory in the prosecution of the work, it may be said that the evidence also shows that a considerable portion of the

delay was caused by acts of the architect, which it seems to us were not warranted by the necessities of the case. It also appears that on April 22, 1911, which was some considerable time after the expiration of the time for the completion of the building, the owners paid to the contractors upon the work $1,432, and at a time when, according to the claims of the owners, the building was defectively constructed and far from being completed according to the plans and specifications. While the owners claim that they were unable to complete the building until July 12th, nearly two months after they took possession of it and commenced work thereon, it seems to us, from an examination of items of their claimed damages, that they could have finished the building so as to make it comply with the contract in a much shorter time. Having in view all of the facts and circumstances touching the respective faults of the contractors, the architect, and the owners, and the payment of a large sum to the contractors after the contract time for completion and when the owners were claiming defective construction, we conclude that it is wholly impracticable to apportion the claimed damages for delay in the finishing of the building, and therefore none should be allowed under the demurrage clause in the contract. This conclusion finds support in the following decisions: *Champlain Const. Co. v. O'Brien*, 117 Fed. 271; *Cooke v. Odd Fellows' Fraternal Union*, 49 Hun 23, 1 N. Y. Supp. 498; *Hutton Bros. v. Gordon*, 2 Misc. Rep. 770, 23 N. Y. Supp. 770; *Brodek v. Farnum*, 11 Wash. 565, 40 Pac. 189.

We have noticed that one of the items of damage allowed to the owners against the contractors is that of $10,170, the total of the liens and costs adjudged in favor of the laborers and materialmen. No contention is made by counsel for the contractors, the bank, and the surety company against this item of damage, except in so far as the court awarded to the lienors attorney's fees in each of their foreclosures, and allowed the amount of such attorney's fees as a part of the

owner's damages against the contractors. The complaint seems to be that the owners did not use due diligence in settling these claims without waiting for judgment of foreclosure to be rendered upon each of them. We think it plain, however, from the evidence that the owners used due diligence by seeking from the contractors information relative to the just amounts due upon the lien claims, without receiving such information as would have justified their payment by the owners. We think, under the circumstances, the owners were not obliged to settle with the claimants before judgment was rendered foreclosing their claims, in order to mitigate the increased damages caused by allowing of attorney's fees in the foreclosures.

Some contention is made that the surety company should in any event be released and no judgment be rendered upon its bond in favor of the owners. This contention seems to be rested upon the assumption that there had been material changes in the building contract. We think it plain from the evidence that whatever change was made in the way of additions, authorized in writing by the architect or owners, came to the notice of the surety company in due time, and that its consent was given thereto with the understanding that its liability upon the bond should not be impaired; and in view of the fact that the only damages finally awarded to the owners as the result of the final disposition of the cause by our decision are those resulting from liens and defective construction, we are of the opinion that no legal ground exists upon which the surety company can be relieved from liability.

We conclude that the trial court erred in allowing the contractors the sum of $1,883.45 for extra work and material, except small items included therein amounting to $219.70, as to which there is no dispute; that is, there was error in allowing $1,663.75 to the contractors for extras; and also that the trial court erred in allowing to the owners the sum of $990 for overtime under the demurrage clause of the contract. It follows that the difference between these

sums, to wit, $673.75, should be added to the judgment in favor of the owners. The cause is remanded to the trial court with direction to correct its judgment accordingly.

While this disposition of the cause results in a judgment somewhat more favorable to the owners than that rendered in the superior court, we conclude that no judgment should be rendered in this court in favor of either party for costs. We arrive at this conclusion in view of the fact that both sides have appealed, and that both have been in a measure successful in their contentions here. This makes the question of costs in this court a matter of discretion with us. Rem. & Bal. Code, § 1744 (P. C. 81 § 1241).

CROW, C. J., MOUNT, CHADWICK, and GOSE, JJ., concur.